**IN RE: Mark J. ESCOTO, Debtor.**

**Robert G. Hillsman, Plaintiff,**

**v.**

**Mark J. Escoto, Defendant.**

**BK–S–13–10096–MKN**
**Adversary No.: 13–01058–MKN**

United States Bankruptcy Court,
D. Nevada.

Date: June 2, 2014, Time: 9:30 a.m.

Signed July 3, 2014

214

Adam P. Bowler, Adam P. Bowler & Associates, Las Vegas, NV, Candace C. Carlyon, Matthew R. Carlyon, Morris Polich & Purdy, LLP, Henderson, NV, for Plaintiff.

Emelia L. Allen, Las Vegas Sands Corp., Samuel A. Schwartz, Las Vegas, NV, for Defendant.

## MEMORANDUM DECISION AFTER TRIAL [1]

Honorable Mike K. Nakagawa, United States Bankruptcy Judge

On June 2, 2014, a trial was conducted in the above-captioned adversary proceeding. The appearances of counsel were noted on the record. After argument was presented, the matter was taken under submission.

## BACKGROUND

On January 4, 2013, Mark J. Escoto ("Debtor") filed a voluntary Chapter 7 petition. On his Schedule "F," Debtor listed Robert Hillsman ("Hillsman") as having an unsecured claim in the amount of $200,000 based on a personal loan.

On April 8, 2013, Hillsman commenced the instant adversary proceeding. The adversary complaint seeks to determine the dischargeability of the personal loan pursuant to Section 523(a)(2)(A) and Section 523(a)(2)(B). (AECF No. 1). On May 15, 2013, Debtor filed an answer.[2] (AECF No. 7).[3]

On August 16, 2013, an order was entered scheduling a pretrial conference and a trial. (AECF No. 10). On February 3, 2014, an order was entered approving a stipulation between the parties that rescheduled the discovery deadline to April 30, 2014, the pretrial conference to May 21, 2014, and the trial to June 2, 2014. (AECF No. 19).

On January 30, 2014, Debtor filed a motion for summary judgment ("SJ Motion"). (AECF No. 13). On March 19, 2014, Hillsman filed his opposition to the SJ Motion that included a Countermotion for Summary Judgment ("SJ Countermotion"). (AECF No. 25). On April 16, 2014, an order was entered denying both the SJ Motion and the SJ Countermotion. (AECF No. 29).

On May 12, 2014, the parties filed a joint pre-trial memorandum ("Joint Memorandum"). (AECF No. 34). In that pre-trial memorandum, Hillsman indicated that he

---

1. In this Memorandum Decision, all references to "ECF No." are to the numbers assigned to the documents filed in the above-captioned bankruptcy case as they appear on the docket maintained by the Clerk of the Court. All references to "AECF No." are to the documents filed in the above-captioned adversary proceeding. All references to "Section" are to the provisions of the Bankruptcy Code, 11 U.S.C. §§ 101–1532. All references to "NRS" are to provisions of the Nevada Revised Statutes.

2. The answer included a number of affirmative defenses, including laches, waiver, and estoppel.

3. This adversary proceeding is a core matter under 28 U.S.C. § 157(b)(2)(I). Both parties have consented to the court's entry of a final judgment. (AECF No. 8).

would seek a determination of nondischargeability only under Section 523(a)(2)(A).

## APPLICABLE ELEMENTS UNDER SECTION 523(a)(2)(A).

 Hillsman seeks a determination that the funds loaned to the Debtor should be excepted from discharge under Section 523(a)(2)(A). Hillsman, as the plaintiff, bears the burden of proof by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

A debtor may not receive a discharge under Section 727(b) of any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by... (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial conditions." 11 U.S.C. § 523(a)(2)(A).

 In order to establish a claim under Section 523(a)(2)(A), a creditor must prove: "(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct." *Turtle Rock Meadows, etc. v. Slyman (In re Slyman),* 234 F.3d 1081, 1085 (9th Cir.2000); *Sachan v. Huh (In re Huh),* 506 B.R. 257, 262 (9th Cir. BAP 2014). The "intent to defraud is a question of fact," and the "intent to deceive can be inferred from the surrounding circumstances." *Cowen v. Kennedy (In re Kennedy),* 108 F.3d 1015, 1018 (9th Cir.1997).

 It is well-established that nondisclosure of a material fact constitutes a fraudulent representation under Section 523(a)(2)(A) where the debtor has a duty to disclose. *See Apte v. Japra (In re Apte),* 96 F.3d 1319, 1323–24 (9th Cir. 1996). In a business transaction, parties owe each other a duty to disclose if because of the relationship between them, the customs of the trade, or other objective circumstances, a reasonable expectation of disclosure is created. *Id.* at 1324.

 Where a creditor's claim under Section 523(a)(2)(B) is based on a forbearance, the creditor must prove that at the time of the forbearance "it had valuable collection remedies." *See Stevens v. Nw. Nat'l Ins. Co. (In re Siriani),* 967 F.2d 302, 305 (9th Cir.1992). The same requirement applies where a forbearance is obtained through misrepresentation and fraud encompassed by Section 523(a)(2)(A). *See Cho–Hung Bank v. Kim (In re Kim),* 163 B.R. 157, 161 ( 9th Cir. BAP 1994), *aff'd and adopted,* 62 F.3d 1511 (9th Cir. 1995).[4] *See, e.g., Locke v. Milner (In re Locke),* 205 B.R. 592, 598 (9th Cir. BAP 1996) (creditor lost valuable collection right where landlord did not call first letter of credit and debtor had fraudulently induced creditor to issue second letter of credit in favor of the landlord); *Antioch Community Federal Credit Union v. Pagnini (In re Pagnini),* 2012 WL 5489032 at *5–6 (9th Cir. BAP 2012) (creditor lost no valuable collection remedies when it failed to demonstrate that repossession and sale of collateral would have resulted in greater proceeds than if it had not refinanced the loan based on false information provided by the debtor); *California Bank & Trust v. Kahn (In re Kahn),* 2013 WL 5881618 at

---

4. Other circuits do not share the Ninth Circuit's view on the requirement of establishing the loss of a valuable collection remedy, *see*

*Wolf v. Campbell (In re Campbell),* 159 F.3d 963, 966 (6th Cir.1998), but this court is bound by *Siriani* and *Kim.*

*14 (Bankr.S.D.Cal.2013) (creditor failed to present evidence that right to foreclose on collateral and sue for deficiency had lost value during fraudulently obtained extensions); *Husain v. Chopra (In re Chopra)*, 2013 WL 1681773 (Bankr.N.D.Cal.2013) (creditor failed to demonstrate the existence of valuable collection remedies under factoring agreement allegedly lost as a result of fraudulent settlement agreement); *Banner Bank v. Bell (In re Bell)*, 2010 WL 4809123 at *5 (Bankr.W.D.Wash. 2010) (bank failed to demonstrate what it could have collected from accounts receivable collateral had it not extended due date of loan). In addition to proving the actual existence of valuable collection remedies at the time of the forbearance, the creditor must prove that such remedies lost value during the period of forbearance. *See In re Kim*, 163 B.R. at 161. Such proof is required to meet the proximate cause and damage elements of the claim. *Id.*

### THE EVIDENCE PRESENTED

Thirty-two exhibits were admitted into evidence and three witnesses testified at trial. All of the witnesses were subject to cross-examination.

**A. *The Exhibits.***

1. Promissory Note dated February 11, 2008

2. Demand Promissory Note dated March 10, 2008

3. Cashier's Check for $200,000 issued March 10, 2008

4. Amending Agreement dated March 10, 2011

5. Email from Shirley Escoto to Robert Hillsman dated April 22, 2007

8. Debtor's Bankruptcy Schedules and Statements filed January 4, 2013

9. Debtor's Chapter 7 Statement of Current Monthly Income filed January 4, 2013

10. Debtor's Financial Disclosure Form filed December 27, 2012 in Case No. D–10–428083

11. Reaffirmation Agreement filed April 1, 2013

12. Application for Order to Show Cause filed May 29, 2013 in Case No. D–10–428083

15. Christopher Homes LLC's Motion for Good Faith Settlement filed August 19, 2009 in Case No. A507086

16. Court Minutes of August 20, 2008, in Case No. A507086, with terms of Christopher Homes Good Faith Settlement

17. Order Granting Christopher Homes Motion for Good Faith Settlement in Case No. A507086, filed September 4, 2008

18. Plaintiff's Petition to Compromise Minors' Claims filed November 14, in Case No. A 507086

19. Executive Plumbing, Inc.'s Opposition to Plaintiff's Petition to Compromise Minors' Claims filed November 21, 2008 in Case No. A507086

20. Plaintiff's Reply in Support of Petition to Compromise Minors' Claims filed November 21, 2008 in Case No. A507086

21. Order Approving Plaintiffs' Petition to Compromise Minors' Claims filed January 28, 2009 in Case No. A507086.

22. Plaintiffs' Petition to Compromise Minors' Claims filed November 2, in Case No. A507086

23. Executive Plumbing's Motion for Determination of Good Faith

Settlement filed November 20, 2009 in Case No. A507086

24. Court Minutes of November 24, 2009, granting Executive Plumbing's Motion for Determination of Good Faith Settlement in Case No. A507086

25. Order Approving Plaintiffs' Motion to Compromise Minors' Claim filed December 19, 2009, in Case No. A507086

26. Stipulation and Order for Dismissal of Litigation with Prejudice filed February 11, 2010, in Case No. A507086

28. Motion to Enforce Attorneys' Lien filed January 22, 2010, in Case No. A507086

29. Order on Motion to Enforce Attorneys' Lien filed February 9, 2010, in Case No. A507086

30. Executive Plumbing's Petition for Release of Certain Interpleaded Cost Funds filed May 5, 2010, in Case No. A507086

34. Minute Entry dated April 14, 2008, in Case No. D252738.

A. Notice of Entry of Final Divorce Decree, filed January 21, 2014, in Case No. D–10–428083Z

E. Amended Complaint to Determine Dischargeability of Debts filed April 11, 2013, in Case No. 12–05066–BTB

F. Demand Promissory Note, Exhibits B and C to Amended Complaint to Determine Dischargeability of Debts in Case No. 12–05066–BTB

G. Demand Promissory Note, Exhibit D to Amended Complaint to Determine Dischargeability of Debts in Case No. 12–05066

H. Amended Agreement, Exhibit F to Amended Complaint to Determine Dischargeability of Debts in Case No. 12–05066

I. Email dated January 12, 2013, from Robert Hillsman to Mark Escoto

In addition to the foregoing, several additional marked exhibits were the subject of testimony by certain witnesses, but the exhibits were not admitted into evidence.[5]

### B. The Witness Testimony.

#### 1. Robert Hillsman ("Hillsman").

Hillsman testified that he is a board certified anesthesiologist who is no longer able to practice due to certain slow-release medication he is required to take. He has insurance to cover his 100% disability, but the medication he takes does not affect his ability to testify.

The medication he takes is related to an injury to his jaw that caused damage to his temporomandibular joint ("TMJ"). The injury occurred in 2003 and Hillsman was referred to the Debtor for treatment through a mutual acquaintance named Pat O'Connor ("O'Connor"). Hillsman became a patient of the Debtor in August 2003.

Hillsman testified that the Debtor approached him to borrow money in connection with a construction defect lawsuit that the Debtor was pursuing against Christopher Homes. Debtor had explained that his children were getting sick due to the construction defects in his residence and that he needed money to finance the expert witness fees and attorney's fees to continue with the litigation. Hillsman testified that in April 2007, he received an

---

**5.** Prior to trial, the parties had stipulated to the authenticity of certain marked exhibits but not to their admissibility.

email from the Debtor's wife, Shirley Escoto, setting forth a timeline of the construction defect litigation. The discussions continued and in February 2008, the Debtor transmitted to Hillsman a draft of a promissory note in the principal amount of $200,000. Hillsman, however, did not accept that draft and instead prepared a separate Demand Promissory Note using certain "business deluxe" software that Hillsman uses for other transactions.

Hillsman testified that the Demand Promissory Note tracks the draft sent by the Debtor and provides for interest-only payments and the $200,000 balance to be paid three years after execution of the note, or upon settlement of the Christopher Homes Litigation. He acknowledged that the Demand Promissory Note refers to a pledge of an office building and of the Debtor's dental practice, but that he never requested or obtained a deed of trust against the building nor did he request or obtain a financing statement with respect to the dental practice. To fund the loan, Hillsman testified that a cashier's check in the amount of $200,000 was obtained from Wells Fargo Bank payable to the Debtor. He believed that all of the loan would be used to fund the litigation.

Hillsman testified that after the Demand Promissory Note was signed on March 10, 2008, he continued to socialize with the Debtor and continued to be a patient of the Debtor. He even attended a birthday party for the Debtor held at the Bellagio Hotel and also went on an Alaskan fishing vacation with the Debtor along with their mutual friend, O'Connor. Hillsman also testified that in December 2009, he received a frantic phone call from the Debtor's wife, Shirley Escoto, who asked him to come down to the hospital where the Debtor underwent emergency gall bladder surgery. He testified that, at the time he went to the hospital, he was not aware that

the Christopher Homes Litigation had been settled.

Hillsman testified that in March 2011, the Debtor requested a one-year extension of the loan. He testified that the Debtor stated that the Christopher Homes Litigation had not been settled and that he needed more time to complete the litigation. Upon that representation, Hillsman testified that he prepared an Amending Agreement, using the same software, that extended the due date on the Demand Promissory Note for one year. He testified that had he known the Christopher Homes Litigation had been settled, he would never have agreed to the extension and would have undertaken steps to demand payment on the loan.

Hillsman testified that at one point in time, the Debtor asked him for assistance in locating an expert for the Christopher Homes Litigation and Hillsman referred him to one of his former professors at the University of Colorado. He testified that he was not aware of any settlement taking place. He testified that he never assisted the Debtor in finding a lawyer and never attended any meetings with a lawyer.

Hillsman testified that by February 2012, the Debtor had missed several monthly interest-only payments required by the Demand Promissory Note. In addition to missing several payments, Hillsman testified that some of the monthly payments were late. Other than telephone calls, Hillsman never sent the Debtor a written notice of default on the loan, a demand for late fees, or a demand for an accounting. Nor did he attempt to pursue the collateral pledged on the loan. After February 2012, Hillsman testified that the Debtor started dodging his phone calls.

Hillsman testified that in August 2012, he met with the Debtor at T–Bones Steakhouse at Red Rock casino where the Debtor represented that he had a moral

obligation and swore "on the lives of my children" that he would pay the debt. Debtor also mentioned, however, that Hillsman "was lucky" that the debt was not included in Shirley Escoto's impending bankruptcy.

Hillsman testified that in January 2013, he received notice that the Debtor had filed a bankruptcy petition. He took the notice to attorney Adam Bowler, who was representing Hillsman in a different, prior bankruptcy case filed by Rosalie Morgan, and attorney Bowler discovered that the Christopher Homes Litigation had been settled with Executive Plumbing. He testified that he learned that the construction defect litigation had been settled in two parts: one settlement in the amount of $350,000 with Christopher Homes in 2008, and a second settlement with Executive Plumbing. He testified that at no time after the Demand Promissory Note was executed did the Debtor inform him of either settlement, even during the times they socialized. Hillsman testified that had he known of the settlements, he would not have entered into the Amending Agreement extending the due date on the Demand Promissory Note.

Hillsman acknowledged that on January 12, 2013, he sent an email to the Debtor and explained that the email referred to a variety of topics discussed or pending between them, including the Debtor's divorce from Shirley Escoto, the inclusion of Hillsman's claim in Shirley Escoto's bankruptcy, a possible trip with the Debtor to Miami to obtain a form of steroids from a source that the Debtor uses for himself, the Debtor's ongoing litigation over his house, and the like. Hillsman did not recall receiving a response to the email from the Debtor.

Hillsman testified that as of the date of trial, he was owed the $200,000 principal amount of the Demand Promissory Note, plus unpaid interest in the amount of $41,944.57 and late charges in the amount of $24,660.85. He testified that he had paid attorney's fees through May 31, 2014, totaling $50,483.82 and estimated that the total amount of attorney's fees and costs incurred through trial would be $60,483.82, i.e., an additional $10,000 after May 31, 2014. Thus, he testified that the total amount he is seeking on his claim through the date of trial is $327,089.24.

### 2. *Shirley Escoto ("Shirley").*

Shirley is the Debtor's former wife. She testified that she sent the email to Hillsman on April 22, 2007, to get Hillsman up to speed on the Christopher Homes Litigation. She testified that the litigation was bifurcated into separate $350,000 settlements with Christopher Homes and Executive Plumbing. Those settlements were reached after separate mediations that she attended along with the Debtor. She had understood from her husband that Hillsman was paid immediately out of the Christopher Homes settlement, but never confirmed that with Hillsman. She testified that she has no recollection of the Debtor ever telling Hillsman that the Christopher Homes Litigation was finished.

Shirley testified that Hillsman and the Debtor were friends. She even called Hillsman when the Debtor was having problems with his gall bladder. At the time of her then-husband's emergency gall bladder surgery in December 2009, she believed that Hillsman had been paid even though she never confirmed such a payment. Even if he had not been paid, Shirley testified that she would have called Hillsman because he was a good man. Other than contacting Hillsman regarding her husband's gall bladder problems, she had no other private conversations with Hillsman. Shirley has no recollection of ever hearing the Debtor tell Hillsman that

the litigation was finished. She testified that it was her understanding that Hillsman would be paid once the litigation was settled.

Shirley testified that her divorce from the Debtor involved two separate steps. She testified that there was an initial divorce decree entered in the Summer of 2009 that was set aside by the family court as a "sham divorce" based on that court's finding that the Debtor had engaged in fraud and misrepresentation. In spite of the divorce decree, Shirley still lived with the Debtor and even went on a Hawaiian vacation with him. After the first divorce decree was set aside, the dissolution proceeding went forward and the marriage was terminated. Shirley testified that after the first divorce decree was set aside, the Debtor withdrew approximately $370,000 from a joint account at "Black Mountain Red Rock," leaving her only $19.70. Shirley testified that she currently is unemployed, is attempting to finish her education, and has no ability to repay Hillsman on the Demand Promissory Note.

Shirley testified that the Debtor asked that she be randomly tested for drug use during the divorce proceeding. She testified that she tested positive for cocaine use but that the drug had been provided to her by the Debtor at the family residence. Shirley testified that the Debtor was drug tested as well but had cut his hair very short before going to court.

### 3. *Mark Escoto ("Debtor").*

Debtor testified that he is a dentist who specializes in TMJ and pain management. Hillsman was referred to him by O'Connor and has been a patient since August 2003. He became good friends with "Dr. Bob."

Debtor testified that in 2005, he was involved in a construction defect lawsuit against Christopher Homes. Significant expenses were being incurred and he requested a loan from Hillsman. They discussed such a loan over several months and his then-wife Shirley Escoto sent Hillsman an email setting forth the status of the litigation. Debtor sent Hillsman a draft promissory note that referred to repayment by March 2011 or at the time there is a final judgment in the Christopher Homes Litigation, while the note prepared by Hillsman referred to repayment within three years or upon settlement of the lawsuit. He acknowledged that the Demand Promissory Note prepared by Hillsman contains provisions for seven percent annual interest, ten percent late charges, attorney's fees and costs. He testified that he was late in some of the monthly payments until he stopped making payments altogether in April 2012.

Debtor testified that there were two separate settlements reached in the Christopher Homes Litigation, the second of which was with Executive Pluming in the amount of $350,000. He acknowledged that in both March 2014 and April 2014, he had testified in a deposition to the existence of only one settlement, but testified that he had forgotten about the other settlement during his prior testimony.

Debtor testified that he had reviewed the list of agreed facts appearing in the Joint Statement prepared in connection with the adversary proceeding, but would not agree that there were two settlements because he had forgotten about the other settlement.

Debtor testified that he attended multiple mediation sessions that resulted in the settlement with Christopher Homes, which was approved by the state court. He testified that he attended a mediation on July 16, 2008, which resulted in the $350,000 settlement with Christopher Homes. He testified that the settlement produced a net of $118,000 that he received at the end of 2008. Debtor testified that he used

those settlement proceeds to pay for additional expert witnesses to proceed against Executive Plumbing and to pay for reconstruction of the residence, but not to repay Hillsman under the Demand Promissory Note. He testified that the settlement with Christopher Homes included approval of claims involving his minor children which were objected to by Executive Plumbing because the settlement allocated only $1,000 apiece to the claims of the minors. Ultimately, $2,500 was allocated to the minor children.

Debtor testified that a separate $350,000 settlement was reached with Executive Plumbing in October of 2009, but he did not tell Hillsman at the time. Debtor testified that he later got into a dispute with his attorney, Judd Ballmer ("Ballmer"), regarding the fees he was charging. He testified that Ballmer had substituted into the case in 2007 because his previous attorney was not making any progress. He testified that Hillsman accompanied him to meetings with his prior attorney, Carrie Hurtik ("Hurtik"), that Hillsman gave him Ballmer's name, and that Hurtik had been paid part of the proceeds of the first settlement. Debtor testified that he signed the settlement agreement with Executive Plumbing only after Ballmer filed a motion to enforce an attorney's lien. He testified that he and his wife were upset with the settlement amount because it would not be enough to repair the home after four years of litigation. Debtor testified that he received $142,000 out of the settlement with Executive Plumbing in February 2010, but did not pay that amount to Hillsman. Instead, he made only interest payments on the Demand Promissory Note.

Debtor testified that when he had his emergency gall bladder surgery in December 2009, he was sedated and was unable to speak to Hillsman. He testified that Hillsman was unaware at that time that the lawsuit had been settled.

Debtor testified that in March 2011, he requested an extension of the deadline to repay the Demand Promissory Note. He testified that he informed Hillsman in March or April 2010 that the Christopher Homes Litigation had been settled when he made catch-up payments. He acknowledged that he had previously testified in his deposition in April 2014 that he had no memory of when he told Hillsman that the litigation had been settled. Debtor testified that he made some catch up payments on the loan in March 2010 and that Hillsman knew that some of the money was from the Executive Plumbing settlement. He testified that no one witnessed the disclosures to Hillsman. He acknowledged that in prior deposition testimony he had testified to the contrary.

Debtor testified that many of the statements made in his prior deposition testimony were incorrect. He acknowledged making many statements during his prior depositions which were incorrect but for which he was subsequently corrected during the depositions, as well as statements for which he now knows to have been incorrect based on his subsequent review of documents.[6] Debtor testified that he

---

6. In his two-part March 2014 deposition, Debtor testified, among other things: (1) that he did not remember why his first divorce decree was set aside; (2) that he did not know where Shirley lives; and (3) that the settlement with Executive Plumbing was the only settlement received in the constructive defect litigation. In his April 2014 deposition, Debt- or testified, among other things: (1) that there has never been a finding that he testified falsely in connection with his divorces; (2) that he did not recall the judge in his second divorce finding that he had committed misconduct; (3) that he did not know if his father ever accused him of defrauding his mother; (4) that he has never violated a court order;

was caught off guard by the March depositions and was not prepared. He testified that after his depositions were taken in March and April, 2014, he reviewed his testimony in addition to various documents that he believed had not been requested in discovery, and is able to testify accurately at trial.

Debtor testified that he had submitted a financial disclosure in his divorce proceeding dated December 27, 2012, which was eight days before he filed his bankruptcy petition. He testified that the income amounts on his financial disclosure were materially different from the amount in his bankruptcy schedules and means test statement, but that he had relied on an accountant and a different attorney for his divorce proceeding. He acknowledged that the financial disclosure and the bankruptcy schedules omitted certain vehicles, and that a debt to his sister was not scheduled. Debtor testified that a Land Rover that should have been scheduled in the bankruptcy was sold after the bankruptcy, with half of the proceeds going to Shirley Escoto and the other half being kept by him rather than being turned over to the bankruptcy trustee assigned to his case. Debtor also testified that certain monthly obligations reflected on the means test statement were not being paid as of the time the means test statement was filed.

Debtor testified that the net income figure on profit and loss statement for JAEMSS, LLC does not reflect income actually received by him. He also testified that the balance sheet for Mark J. Escoto, D.D.S., Ltd., reflects that he had borrowed $217,833 over a twenty-five year period as the sole shareholder.

Debtor testified that he had a meeting with Hillsman at Red Rock prior to filing for bankruptcy. He believes that he informed Hillsman that he was intending to file for bankruptcy, but that Hillsman took no steps to declare a default or to execute on his lien.

Debtor testified that he does not dispute that he owes Hillsman for principal, interest and late fees. He testified that he first learned that Hillsman was demanding late fees and attorney's fees at the trial. He acknowledged that at his April 2014 deposition he did not dispute that there are late fees owed. Debtor testified that he had read the complaint that Hillsman filed in the case but did not remember that late fees or attorney's fees were requested. He does not recall any specific amount of late fees being requested prior to the trial and no request for attorney's fees.

Debtor acknowledged that an order was entered by the family court setting aside the initial divorce decree that included many specific factual findings, but testified that he disagreed with the findings and that they included findings based on fabricated testimony by Shirley Escoto.[7] As to the final divorce decree, Debtor testified that his prenuptial agreement was upheld but that he was ordered to pay $10,000 in attorney's fees to Shirley Escoto. Those attorney's fees were paid from her half of

(5) that he has never failed a court-ordered drug test; (6) that he has never had visitation with his children suspended for failure to take a court-ordered drug test; and (7) that he did not remember when he first told Hillsman that the lawsuit had been settled.

7. During cross-examination by Hillsman's attorney, the findings in the order setting aside the divorce decree were reviewed with the Debtor. He acknowledged that the family court had made multiple findings that the Debtor's testimony was not credible. A copy of the order had been marked as Exhibit "7" but was not moved into evidence. Debtor's testimony, however, established that the pertinent findings had been made by the family court.

the proceeds of the sale of the Range Rover.

## DISCUSSION

As previously noted, Hillsman must establish by a preponderance of the evidence: (1) that the Debtor engaged in a misrepresentation, fraudulent omission or deceptive conduct, (2) that the Debtor knew that his statements or conduct were false or deceptive; (3) that the Debtor had the intent to deceive; (4) that Hillsman justifiably relied on the statements, omissions or conduct of the Debtor, and (5) that Hillsman sustained damage proximately caused by the Debtor's representations or conduct. Hillsman can establish the Debtor's intent by circumstantial evidence.

In this case, it is unclear whether Hillsman is proceeding under a theory that the Debtor obtained the original loan by misrepresentation and fraud, *see* SJ Countermotion at 3:15–16, or under a theory that the Debtor obtained the extension of the due date by misrepresentation and fraud. *See* Joint Memorandum at 11:6 to 12:16, *citing In re Ramey*, 454 B.R. 640 (Bankr. E.D.Va.2011). Most of the evidence and arguments appear to address the latter theory. Both theories, however, will be addressed below.

### 1. *Fraud in Connection with the Demand Promissory Note.*

■ With respect to the Demand Promissory Note, the evidence establishes that the Debtor and his wife, Shirley Escoto, solicited the loan from Hillsman starting early in 2007. Debtor represented that he was involved in the Christopher Homes Litigation and that he needed funds to complete it, including the payment of expert witness and attorney's fees. In April 2007, the Debtor had his then-wife, Shirley Escoto, send Hillsman an email message setting forth a chronology of the litigation. The draft Promissory Note that the Debtor prepared stated that Hillsman would be paid on or before March 1, 2011, or at the time there is a final judgment in the Christopher Homes Litigation. The Demand Promissory Note prepared by Hillsman and signed by the Debtor and his wife, Shirley Escoto, states that Hillsman will be paid on demand, or at the end of three years from execution of the note, or upon settlement of the Christopher Homes Litigation. The Demand Promissory Note was signed on March 10, 2008, and the three year maturity period therefore expired on or about March 10, 2011.

No one disputes that at the time the Demand Promissory Note was signed, the Christopher Homes Litigation was ongoing. No one disputes that the Debtor and his then-wife had incurred substantial expert witness and attorney's fees in pursuing the litigation.[8] No evidence was presented that at the time the Demand Promissory Note was signed, a settlement of the Christopher Homes Litigation was imminent. No evidence was presented, nor has Hillsman argued, that at the time the Demand Promissory Note was signed, the Debtor and his then-wife had no intention of repaying the loan on demand, at the end of three years, or upon settlement of the Christopher Homes Litigation. Under these circumstances, Hillsman has

---

**8.** It appears that Ballmer had a contingency fee arrangement and was paid forty percent of the first settlement with Christopher Homes, i.e., $140,000. Debtor testified that out of that settlement, he and his wife netted $118,000. Presumably, the remaining balance of the $350,000 gross settlement, i.e., $92,000, was applied to Hurtik's fees, expert witness fees, medical expenses, or other litigation costs. It is unclear, however, how attorney's fees were being "incurred" if the Debtor's litigation counsel were being paid on a contingency rather than an hourly basis.

not met his burden of proving that the Debtor made a misrepresentation or omission as to the current status of the Christopher Homes Litigation, the necessity for payment of substantial expert witness and attorney's fees for the litigation, or as to the Debtor's intention to repay the loan at the times specified in the Demand Promissory Note.

Absent this threshold showing of the first element of a claim under Section 523(a)(2)(A), none of the remaining elements can be, nor have been met. Thus, as to the Demand Promissory Note, Hillsman has failed to meet his burden of proof.

### 2. *Fraud in Connection with the Amending Agreement.*

Also as previously set forth, nondisclosure of a material fact may constitute a fraudulent representation under Section 523(a)(2)(A) where the debtor has a duty to disclose. Where the fraudulent representation results in a creditor's forbearance, the creditor must prove that valuable collection remedies existed at the time the forbearance occurred and that such remedies lost value during the period of forbearance.

The parties acknowledge that the Demand Promissory Note was signed on March 10, 2008, and by its terms expired on or about March 10, 2011. No one disputes that on March 10, 2011, the Amending Agreement was executed by Hillsman, the Debtor and Shirley Escoto. By its terms, the Amending Agreement did not change the requirements of the Demand Promissory Note and only granted a one year forbearance by extending the payment deadline.

Hillsman maintains that in obtaining the Amending Agreement, the Debtor misrepresented the status of the Christopher Homes Litigation by concealing from Hillsman that separate settlements already had been reached with Christopher Homes in 2008 and with Executive Plumbing in 2009. Hillsman asserts that he had no knowledge of the settlements and that his attorney, Bowler, obtained information about the settlements only after Hillsman received notice of the Debtor's bankruptcy filing. He contends that the concealment was intentional and that he justifiably relied to his detriment. Hillsman asserts that he would never have agreed to forbear from collecting on the Demand Promissory Note if he had known the Christopher Homes Litigation had already been settled for $700,000.

Debtor maintains that while Hillsman was never informed of the Christopher Homes settlement when it took place in 2008, and was never informed of the Executive Plumbing settlement when it took place in 2009, he informed Hillsman of both settlements during a private conversation that occurred some time in March or April of 2010. Thus, he contends that the forbearance provided by the Amending Agreement was not the result of a concealment of or failure to disclose material information.

The court having considered the record concludes that Hillsman did not learn of the settlements in the Christopher Homes Litigation until after the Debtor filed his bankruptcy petition. As between Hillsman and the Debtor, the court finds Hillsman's testimony to be more credible. With respect to the Debtor, the court has taken into account the unfavorable findings as to his credibility made by two separate courts in his divorce proceeding with Shirley Escoto. The court also has taken into account the inconsistencies revealed in the depositions taken of the Debtor on March 5, 2014, March 11, 2014, and April 30, 2014. The court also has taken into account the inconsistencies between the Debtor's testimony during those depositions and his tes-

timony at trial. The court also has taken into account the discrepancies between the Debtor's deposition testimony, the pleadings and papers filed in this adversary proceeding, and the testimony at trial. The court also has taken into account the discrepancies between the financial disclosures made by the Debtor in his divorce proceeding and the disclosures made in the bankruptcy proceeding. The court also has taken into account the Debtor's attribution of his testimonial inconsistencies to a lapse in memory during his depositions, and his ability to now recall critical conversations or events for which: (1) no other witnesses were present, or (2) no corroborating testimony was offered from witnesses who may have been present. In short, while the Debtor testified before the court in a calm and at times glib manner, his testimony simply was not credible on the matters material to Hillsman's claim.

In this instance, Debtor originally induced Hillsman to make the loan based on his need to finance prosecution of the Christopher Homes Litigation. Settlement of the litigation was at least one of the triggering events requiring payment of the Demand Promissory Note. Under these circumstances, the court concludes that the Debtor had a duty to disclose to Hillsman the settlements reached in the litigation. Moreover, the court finds that the Debtor's failure to disclose the settlements was a fraudulent representation on which Hillsman justifiably relied in executing the Amending Agreement.

Because the Amending Agreement was a forbearance on the collection of the Demand Promissory Note, however, Hillsman is required in this circuit to prove that his collection remedies for the loan lost value. In other words, Hillsman must demonstrate that between March 10, 2011, and March 10, 2012, his remedies to collect on the Demand Promissory Note suffered a loss of value.

In both his SJ Countermotion, and in the Joint Statement, Hillsman relies on the decision by the bankruptcy court in *Ramey* where a loan taken by the debtors was determined to be nondischargeable under Section 523(a)(2)(A). In that case, the creditor initially made a loan to the debtors that was to be secured by a deed of trust against their residence. Although the loan was fully repaid by the debtors, they had never recorded the deed of trust. Thereafter, the same creditor made a second loan to the debtors accompanied by a deed of trust against a separate condominium. The condominium, however, already had been listed for sale by the debtors. The debtors offered to give the creditor a separate deed of trust against their residence, but they never prepared a deed of trust. The creditor also never recorded the deed of trust against the condominium. The condominium was later sold by the debtors but they never informed the creditor. Debtors thereafter requested a three-year extension of the second loan without changing its terms, but again did not inform the creditor that the condominium already had been sold. 454 B.R. at 642–44. Approximately 19 months later, the debtors filed a Chapter 7 petition at which time the creditor learned that the debtors no longer owned the condominium. *Id.* at 644.

The *Ramey* court found that the debtors had committed an actionable misrepresentation by failing to inform the creditor at the inception of the second loan that the condominium had been listed for sale, 454 B.R. at 647, and by failing to inform the creditor that the condominium already had been sold when obtaining the extension of the maturity date. *Id.* at 648. The *Ramey* court did not examine what collection remedies the creditor possessed at the

time she agreed to the three-year extension, nor did it examine the loss of any value to those remedies.[9] Instead, the court granted judgment in favor of the creditor for the principal amount of the second loan. *Id.*[10]

In the instant case, the *Ramey* decision is inapposite because Hillsman has not established fraud in connection with the Demand Promissory Note. As *Ramey* does not address the requirements in this circuit on a forbearance theory actionable under Section 523(a)(2)(A), it also is of little persuasive value.

Unfortunately for Hillsman, his collection remedies for the Demand Promissory Note were limited at best. Although the draft Promissory Note prepared by the Debtor stated that "borrower pledges collateral (2471 Professional Court) real property," the Demand Promissory Note prepared by Hillsman states that the Debtor as owner and manager of JAEMSS, LLC "pledges all equity in the LLC including his Dental Practice and the Building housing same, located @ 2471 Professional Court, Las Vegas, Nevada 89128 ... as collateral and security for this note ..." The Demand Promissory Note prepared by Hillsman also states that "Escoto et al further pledge any and all personal possessions holdings and items of value as security and collateral for payment of this note ..."

Hillsman testified that he never requested or obtained a deed of trust against the building referenced in the note ("Commercial Building") where the Debtor had his dental practice. He also testified that he never requested or obtained a financing statement evidencing a security interest in the Debtor's dental practice. He offered no evidence that he requested, obtained, or filed a financing statement referencing a security interest in any personal possessions, holdings, or items of value. He offered no evidence that he had obtained any form of recorded lien against the Debtor's real or personal property assets. For good reason, Hillsman testified that after the Debtor stopped making payments in early 2012, he never attempted to pursue the collateral pledged on the loan.

At the time Hillsman entered into the Amending Agreement, he apparently was a friend and acquaintance of the Debtor, but never more than an unsecured creditor. Although Hillsman asserts that he would never have agreed to a one year forbearance on the Demand Promissory Note had he not been defrauded by the Debtor, he has stated only that he would have pursued collection of the note after it matured on March 10, 2011. But what could he have done?

As of March 10, 2011, Hillsman did not have a deed of trust against the Commercial Building. He also does not purport to have taken an interest or deed of trust against any other real property. Hillsman could not have pursued a nonjudicial foreclosure against any real property to collect on the debt. Moreover, the Debtor's real property Schedule "A" indicates that the Commercial Building was valued at

---

9. One explanation may be that the Fourth Circuit in which the *Ramey* court sits appears to follow the *Campbell* line of authority, *see* note 4, *supra,* that rejected the Ninth Circuit's view in *Siriani* and *Kim. See Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 135 (4th Cir.1999). In fact, the *Ramey* court cited the circuit decision in *Biondo,* albeit for different propositions. 454 B.R. at 645, 647–48.

10. Because the court had determined that the second loan was the result of actionable fraud from its inception, the same judgment amount would have been entered irrespective of the court's determination on the forbearance issue.

$600,000 on the petition date, was titled to JAEMSS, LLC, and was security for a claim in the amount of $1,221,207.01. Additionally, the same schedule indicates that the Debtor's residence located at 1813 Glenview Drive, Las Vegas, Nevada, was valued at $611,772 on the petition date and subject to a secured claim in the amount of $1,044,638. Thus, the only evidence in the record infers that there was no equity in either property out of which Hillsman could have been paid even if he obtained a judgment and sought to enforce a judgment lien against either property.

Other than merely asserting that he would have pursued collection of his unsecured Demand Promissory Note, Hillsman has not identified a valuable collection remedy that he possessed on March 10, 2011, or the degree to which such a remedy lost value as a result of the forbearance.[11] Obviously, Hillsman could have used informal collection methods such as telephone calls, emails or written correspondence demanding payment. Because Hillsman testified that the Debtor simply stopped returning his phone calls, however, there is no evidence that informal collection methods had any value at all.

Hillsman also could have raced the Debtor's many other creditors[12] to the courthouse, commencing suit on his unsecured Demand Promissory Note. Even if he had been able to obtain a judgment immediately, however, Hillsman has not demonstrated how the one year delay from March 10, 2011 to March 10, 2012, damaged him in any way, such as through loss of any nonexempt assets on which to execute a judgment. Under NRS 21.090(3), the State of Nevada has "opted out" of the exemptions set forth under Section 522(d) and the Debtor has asserted his state law exemptions in his Schedule "C." Hillsman has not identified any assets that the Debtor could not have exempted prior to bankruptcy under NRS 21.090(1) and NRS 115.010 if Hillsman had obtained and sought to enforce a judgment.

Likewise, Hillsman has not identified any equitable remedies that could have been pursued nor has he explained how such remedies would have been effective. Even if Hillsman convinced a court that his legal remedies were inadequate, it is doubtful that a constructive trust remedy was available or effective during the forbearance period because the Debtor had already spent the settlement funds he received in 2008 and 2010. *See Locken v. Locken,* 98 Nev. 369, 372, 650 P.2d 803, 805 (Nev.1982)("A constructive trust will arise and affect property acquisitions under circumstances where: (1) a confidential relationship exists between the parties; (2) retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice."); *Roul v. George,* 2013 WL 5781736 at *3 (D.Nev. Oct. 25, 2013). Similarly, even if an equitable lien could be impressed upon the Debtor's residence to the extent the settlement proceeds were used to improve the property, *see Maki v. Chong,* 119 Nev. 390, 393–94, 75 P.3d 376, 379 (Nev.2003), it likely had little value because there was no

---

11. In *Siriani,* the court indicated that a creditor is not required to show that it would have pursued collection remedies in a timely fashion if it had not extended the obligation. 967 F.2d at 306–07. In the instant case, however, Hillsman actually asserts that he would have pursued collection but never even specifies what collection remedies he would have sought, much less demonstrates how the value of his remedies were diminished.

12. In his bankruptcy Schedule "F," Debtor listed unsecured claims exceeding $1,751,867 as of the date he commenced his Chapter 7 proceeding.

equity available on which the lien could attach.

Under these circumstances, Hillsman has failed to identify any collection remedies or to prove that such remedies lost value during the period of forbearance created by the Amending Agreement. Thus, although Hillsman has demonstrated all other elements of his claim, no relief can be afforded under Section 523(a)(2)(A) was respect to the Amending Agreement.[13]

### CONCLUSION

Based on the foregoing, the court concludes that Hillsman has failed to meet his burden of proof under Section 523(a)(2)(A). His claim therefore will not be excepted from the discharge provided by Section 727(b). A judgment in favor of the Debtor has been entered concurrently with this Memorandum Decision. Each party shall bear their own attorneys fees and costs.

This Memorandum Decision constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52.

---

13. Because Hillsman has failed to prove the required elements of his claim under Section 523(a)(2)(A), it is unnecessary to address the Debtor's assertion of waiver or other affirmative defenses.